### THE CHARLOTTE W. MILLER.

### MILLER v. UNITED STATES.

(District Court, D. Rhode Island. June 19, 1923.)

#### No. 1505.

Collision ⬅️39—Submarine held at fault in colliding with sailing schooner.

Where government submarine collided with sailing schooner on Long Island Sound on clear day in attempting to closely shave by the schooner's stern, depending on the speed of the schooner to carry her clear, *held*, the submarine was at fault.

In Admiralty. Libel by Alfred J. Miller, part owner, managing owner, and agent for the other owners of the schooner Charlotte W. Miller, against the United States. Decree for libelant.

Frank Healy, of Providence, R. I., for libelant.

Harold A. Andrews, Asst. U. S. Atty., of Providence, R. I., and Horace T. Atkins and Frank Maytham, Sp. Asst. Attys. Gen., for the United States.

BROWN, District Judge. This court takes jurisdiction of this libel in personam, for collision between the United States submarine steamship D–2, 135 feet long, and the schooner Charlotte W. Miller, 115 feet long, in accordance with a special act of Congress:

"Private—No. 27—67th Congress, Part 2, Page 14 (H. R. 2144).

"An act for the relief of the owners of the schooner Charlotte W. Miller.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that the claim of the owners of the schooner Charlotte W. Miller for damages alleged to have been caused by collision between said schooner and the United States steamship D–2 in the forenoon of Tuesday, July 31, 1917, about two miles east of Cornfield Shoal Lightship, in Long Island Sound, and subsequently on the afternoon of the same day and thereafterwards further injured so that she became a total loss, because the United States steamship Ontario took charge of the sunken schooner, relieving the salvors of the owners then in charge thereof, and herself attempted to tow said sunken schooner to New London, Connecticut, may be sued for by the owners of the said schooner Charlotte W. Miller in the District Court of the United States for the district of Rhode Island sitting as a court of admiralty, and acting under the rules governing such court, and said court shall have jurisdiction to hear and determine such suit and to enter a judgment or decree for the amount of such damages and costs, if any, as shall be found to be due against the United States in favor of the owners of the said

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

schooner Charlotte W. Miller or against the owners of the said schooner Charlotte W. Miller in favor of the United States and upon the same principles and measures of liability as in like cases in admiralty between private parties and with the same rights of appeal: Provided, that such notice of the suit shall be given to the Attorney General of the United States as may be provided by order of the said court, and it shall be the duty of the Attorney General to cause the United States attorney in such district to appear and defend for the United States: Provided further, that said suit shall be brought and commenced within four months of the date of the passage of this act.

· "Approved February 18, 1922."

The collision occurred on July 31, 1917, about 9:30 a. m., on a clear day and a smooth sea. The vessels had plenty of room for maneuvering, and there were no obstructions.

The schooner was light and was on the starboard tack, headed about southwest by south, or about 204 degrees true, sailing close-hauled, by the wind. She was crossing the tide, which ran to the eastward and increased her leeway. Her speed was put by Capt. Hart, her master, at about two knots, with a leeway of about two knots. The testimony from the D–2 gives her a greater speed, four or five knots.

The submarine D–2 was proceeding westerly, 254 degrees true, at a speed of 10 miles per hour, and was undergoing an engineering test, which required maintenance of approximately 10 knots continuous operation for a period of 48 hours. Her master testified—

"I did not stop my engines until actual contact with the schooner."

The vessels were on converging courses, which, if not changed, would have brought about a collision, and the D–2 was an overtaking vessel.

The first movement of the D–2 to perform her duty of keeping clear of the sailing vessel was when the vessels were approximately 1,200 feet apart, when the order was given "right—hard right." The D–2 then began a turning circle towards the schooner by putting her rudder right 25 degrees. The testimony from the D–2 is that she swung approximately 70 degrees, until contact with the schooner.

The D–2 struck the schooner at a right angle, on her port side, just aft of the foremast.

It is manifest that the vessel whose duty it was to keep clear began altogether too late to perform this duty; a common fault, to which many collisions are attributable. Maintaining her 10-knot speed while the distance between the two courses was rapidly narrowing towards the point of intersection, she then took a course towards the schooner, which necessarily involved very close shaving to go clear. Close shaving of another vessel is always to be avoided. The risk of collision is to be avoided by leaving a good fairway for the other vessel. A vessel which, by belated attempts to obey the rules, unnecessarily creates a situation of great danger, cannot expect to be excused upon the ground that when she changed her wheel it was still possible, by a smart maneuver, to get by, though with a narrow margin. It is her duty to give a safe margin, and not to put the other vessel in doubt of the competency of her management.

The effect upon the master of the schooner is evidenced by his re-

289 F.—52

mark, "I wonder what this thing calculates doing." Clinton Barter, the mate of the Miller, testified:

"He had the full length of the Sound to keep clear of us. Why should he directly come up and run into a light vessel? That is something I can't see now, when he could have starboarded his wheel three-quarters of a point, and he would have went clear of us, and went along about his business, and there would have been no collision whatever; but to directly come up and run into us—he has steam and we got sails; and in a light wind what could we do with a sailing vessel?"

The court is in somewhat the same frame of mind as Mr. Barter, and fails to understand why the D–2 should not have starboarded her helm and kept away from the schooner instead of porting her helm and making a turn directly towards her. The circumstances suggest an attempt to execute a smart maneuver at the required speed of 10 knots rather than to provide a safe margin.

The D–2 charges the schooner with a failure to obey article 21, by changing her course and speed to such an extent that it brought her on the turning circle of the D–2. The master of the D–2 testified as follows:

"Q. 28. As your vessel swung to starboard, did you have occasion to note the schooner?

"A. I observed the movements of the schooner very distinctly, and the schooner paid off to the left with her sheets all taut, which gave her a considerable leeway and increased her speed. There was an indication of a subsequent movement in the schooner having gained headway to the right, having put his helm down.

"Q. 29. Did you note whether before the collision the putting down of the helm of this schooner had any effect on her course?

"A. She paid off considerably.

"The Court: How much, in your judgment?

"Witness: Four points.

"Q. 30. Did you or did you not see the schooner luff into the wind?

"A. The schooner luffed into the wind; yes, sir."

He also estimated that from the time he ported his helm to the time of collision was about one minute.

The schooner was on her proper course, and made no change until after the helm of the D–2 was ported.

The master of the D–2 testified that the Miller changed course to the left four points, falling off with the starboard helm, and then luffed nearly back to her original course, at least four points—all that in about a minute.

It is in evidence from witnesses on the D–2 that it took 25 seconds to put the wheel over, and that after the change of wheel she ranged ahead on her course two or three ship lengths before her head swung to starboard. This accords with the well-known effect of helm action. Haynes' Rule of the Road at Sea, p. 119. This would seem to have left less than a minute for the performance of the movements of the schooner described by the commander of the D–2.

Capt. Allen Gurney, a master of sailing vessels for about 43 years, and formerly master of the Miller, testified to the improbability of these movements, saying that it would take about a minute and a half to have kept her off four points, and three minutes to have brought her

THE CHARLOTTE W. MILLER 819

back to her original course, and that she would not come up in the wind without letting down or lightening her head sails.

Capt. Lars Andraessen, a marine surveyor and formerly a master of sailing vessels, also testified to the improbability of the movements attributed to the Miller.

Capt. Hart, of the Miller, testified that he made but one change of the wheel; that he and the mate together rolled the wheel hard down, and that the collision occurred a few seconds after; that the head of his vessel was but slightly changed, and that he did that in order to make the blow easy, a glancing blow, expecting to be struck.

The master and mate of the schooner appeared to be intelligent and competent seamen of long experience, and I accept their testimony as to the handling of the schooner, and that her only change of course was when the mate, who had the wheel, and the master helping him, rolled her wheel hard down a few seconds before the impact—a proper movement in extremis. That the schooner bore off towards the D–2 with her sheets tight seems to me improbable; and that she bore off as much as four points from her course, and then put her wheel hard down and presented her port side to the D–2, seems impossible.

Before any change in the course of the schooner, the D–2 changed her wheel right 25 degrees, on a turning circle which would have crossed the path of the schooner. R. R. Thompson, an officer of the D–2, testified:

"Our best chance was to swing across her stern at that time, depending on her speed to get her out of our turning circle."

Even if there is a possibility that, if the Miller had not changed her wheel and thus lost some headway, she might have passed beyond the turning circle of the D–2, it is admitted that this would have been by a very close shave. But in calculating this possibility it seems necessary to give the schooner a speed much greater than the evidence justifies.

The respondent has failed to show that the schooner did anything which embarrassed or affected the steering of the D–2, or which was a violation of her duty to keep her course and speed.

The conduct of the D–2 after the collision was exemplary. The bow of the D–2 was not withdrawn until the safety of the crew of the schooner was assured. Upon the separation of the vessels, the schooner filled and sank, bow down, stern floating, 10 or 15 feet out of water. The master and crew of the schooner were taken on board the D–2, and carried to New London.

The libel alleges as a second cause of action that the United States steamer Ontario, which took charge of the towing of the wreck of the Miller, towed with such unnecessary force as to cause further and serious injury to the schooner. The Ontario brought the wreck to a point about three-quarters of a mile south by west of Southwest Ledge, and near to the entrance of the harbor of New London, and anchored her. At that point the T. A. Scott Wrecking Company took charge of her, on August 1, 1917, and began salvage operations. She was afterwards raised and towed into the harbor of New London.

There is a suggestion upon the brief for the United States that a

part of the damage was due to the failure of the salvors to act promptly in raising the vessel. There is, however, no substantial evidence to support this suggestion, or to show that she suffered from weather conditions that might have been avoided by earlier action.

In the absence of fault of the salvors, the damage suffered was a natural consequence of the collision. As this is a libel in personam, it is unnecessary to distinguish or apportion the injuries to the schooner suffered from acts of the D–2 and from acts of the Ontario. For the purposes of this case it does not matter whether the damage was caused by one or by both vessels of the United States, or in what proportion they contributed to the total damage.

I am of the opinion that the libelant is entitled to a decree for the full amount of the damage.

A draft decree may be presented by the libelant in accordance with this opinion.